July 2, 2019

Via ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Martin Shkreli*
Case No.: 17-cr-00404 (KAM)

Dear Judge Matsumoto:

We respectfully submit this memorandum on behalf of defendant Martin Shkreli to aid the Court in its determination of a fair and just sentence. As this memorandum illustrates, the strength of Mr. Shkreli's character, the impact he has had on the lives of others, and the vital role he plays in his family and community are truly admirable. Mr. Shkreli is a successful businessman due in large part to his kindness, honesty and integrity. Prior to his commission of this offense, Mr. Shkreli enjoyed a pristine reputation and was a leader and well-respected member of his community. In every aspect of his life, Mr. Shkreli has displayed innumerable acts of personal kindness and charity, putting the interests of others ahead of his own. Despite his offense, he has enormous support from family, friends, and community members who have attested to his character in the letters submitted on his behalf.

Mr. Shkreli has no prior criminal history and is both deeply remorseful and apologetic. He takes full responsibility for his actions and bears the heavy burden of how his poor decisions have negatively affected his family and business. We respectfully ask the Court to impose a sentence of probation as requested by the Government.

## I. PERSONAL HISTORY

### A. Family Background, Education and Employment

Martin Shkreli, currently age 61, was born on December 27, 1957 in Montenegro (formerly part of Yugoslavia) (PSR at ¶ 70).[1] He and his three siblings were raised by their parents in a lower-middle income family. (PSR at ¶ 72). Mr. Shkreli's father was a maintenance worker and his mother was a homemaker. (PSR at ¶ 70).

In 1968, when Mr. Shkreli was ten years old, his parents moved the family to Italy in search of a better quality of life for the children. (PSR at ¶ 72). The family lived in Italy for

---

[1] Citations to "PSR at ___" refer to the Pre-Sentence Report dated August 10, 2018.

THOMPSON HINE LLP        335 Madison Avenue            www.ThompsonHine.com
ATTORNEYS AT LAW         12th Floor                    O: 212.344.5680
                         New York, New York 10017-4611 F: 212.344.6101

about one year before emigrating to the United States in 1970 and settling in the Bronx. (*Id.*). Mr. Shkreli became a U.S. citizen in 1978 at around age 20. (*Id.*). After high school, Mr. Shkreli attended Ulster County Community College where he earned an associate's degree. From there he transferred to Fairleigh Dickinson University in Teaneck, New Jersey graduating in 1982 with a bachelor's degree in marketing. (PSR at ¶ 81).

In 1990, Mr. Shkreli married Drita Ivezaj. (PSR at ¶ 73). She works as a sales associate for Bloomingdale's. (*Id.*). The Shkrelis have three sons, Alex, Nicholas and Kristian. Alex, age 28, works as a project manager at Mr. Shkreli's construction company; Nicholas, age 24, recently enrolled in a Ph.D. program in economics at West Virginia University; and Kristian, age 20 is preparing to begin college. (*Id.*; See Addendum to PSR).[2]

Mr. Shkreli's wife and sons are fully aware of the charges against him and have all been very supportive of him throughout the pendency of this case. (PSR at ¶ 74). The Shkrelis are happily married and have a very close relationship with their sons. (PSR at ¶ 73). During her interview with U.S. Probation, Mr. Shkreli's wife expressed her unequivocal love and support for her husband, described him as a hard-worker and dedicated family man, and believes that he became involved in the instant offense due, in part, to his trusting nature. (PSR at ¶ 74). Mr. Shkreli is very involved in his sons' lives and activities. He attends all of his sons' soccer matches and accompanies his wife to all her medical appointments, including for her recent hip replacement surgery. Mr. Shkreli's oldest son Alex explained that Mr. Shkreli has always been a supportive father and true role model to his family. He writes to the Court:

> Throughout our lives [my father] was somebody we always turned to for advice and guidance. He has been there for us no matter what and always tries to lead by example. My father has always been extremely active in the community. He has constantly been a dynamic member of our soccer programs and fundraisers ever since I can remember. My brothers and I have played soccer for over 22 years and I can't remember a single game where he wasn't there supporting us. His strong family values, kindness and consideration made him a valuable part of our community and somebody for all of us to look up to.
>
> * * *
>
> My father has always been the backbone of this family and has always provided us with the guidance we've needed from him.

(See letter of Alex Shkreli at Ex. 2).

Mr. Shkreli also has a close relationship with his elderly father, currently age 93. The father, who resides with Mr. Shkreli, suffers from diabetes and he and his wife are his primary caregiver. (PSR at ¶ 70). Mr. Shkreli's friend, Hajdar Bajraktari, has known the Shkreli family

---

[2] Since the PSR was completed, Mr. Shkreli's son Kristian was accepted to Fordham University and will begin studying there this Fall.

for many years and informs the Court of Mr. Shkreli's devotion to family, particularly to his elderly, infirm father:

> I [have] noticed the great relationship [Martin] has with his wife, who is always by his side. I [have] noticed how he is with his children and how much he enjoyed attending all of their events, especially their soccer matches. He was always involved with his siblings, hosting events with them or for them. I am especially touched by the relationship [Martin] has with his father. Martin would always show respect and love to his father, and you knew it wasn't an act, it was all genuine, as he even had his father live with him and his family.

(See Hajdar Bajraktari's letter at Ex. 3).

Mr. Shkreli also maintains a close relationship with his three siblings. (PSR at ¶ 71). Both of his brothers work as project managers for Mr. Shkreli's construction company. (*Id.*). Mr. Shkreli's sister is a homemaker and resides with her husband and two children in Zurich, Switzerland. (*Id.*). Mr. Shkreli's siblings are very supportive of him despite his conduct in this matter. (*Id.*).

### B. Mr. Shkreli's Success in Business

After college, Mr. Shkreli worked for six years as a superintendent at a residential building in the Bronx. (PSR at ¶ 84). In 1988, with the skills he learned and the money he saved working as a superintendent, Mr. Shkreli started two sister companies, Alba Construction Company ("Alba") and Jamco Realty Company ("Jamco"). (PSR at ¶ 83). Alba is a general contracting firm and Jamco is a real estate acquisition and management company. (*Id.*).

Mr. Shkreli started his contracting business from the ground up. He did so, not only with the skills he learned in college and the years he spent working as a residential superintendent, but more importantly, through honesty and integrity with his clients and employees. Some of his recent construction projects include work for the Concorde Hotel, 125th Street Holdings, LLC, the School of Visual Arts, the Consulate General of Kosovo and Metropolitan Commercial Bank. (PSR at ¶ 83).

Alex Shkreli, who works as a project manager at Alba, has worked closely with his father for several years and seen first-hand the reasons for his father's business success. He remarks:

> Being that I work with my father, I have gotten to see a side of him that many people don't usually see. Every day, he pushes me to love what I do and has been a great teacher and role model for me. He has taught me to be honest, respectful and kind which is why many of his clients have been with him for almost 20 years. His passion, hard work and dedication is infectious and drives everyone around him to be better.

(See Ex. 2).

Mark DeFazio is the founder, president and CEO of Metropolitan Commercial Bank ("MCB"), a publically traded bank headquartered in New York City. Mr. Shkreli has been Mr. DeFazio's client and friend for nearly thirteen years and has written to the Court regarding, among other things, Mr. Shkreli's integrity as a businessman:

> Martin was introduced to me [in 2006] through an architect we both knew. Not having any experience in building retail bank branches, I interviewed several different contractors all of whom had far larger companies than Martin's. I decided to go with Martin and I am happy to say that Martin has been MCB's exclusive contractor ever since. I chose Martin because I felt deeply that he would "watch my back" and that I could trust him to make the right decisions for the bank. My gut proved to be correct. I have experienced personally the care, honesty and integrity Martin has demonstrated continuously over the past twelve years.

(See Mark DeFazio's letter at Ex. 4). Mr. DeFazio also remarked that over the years, he has become friends with Mr. Shkreli and has spent a great deal of time with the Shkreli family, which he believes "exemplif[ies] a truly loving and caring family." Mr. DeFazio describes Mr. Shkreli as "the leader of his family [who] works tirelessly to set the right example for his three sons." (*Id.*).

### C. Community Involvement and Philanthropy

Mr. Shkreli has been a longstanding leader in the Albanian community and an extraordinary philanthropist dedicating enormous amounts of his time to worthy endeavors. Richard Lukaj has known Mr. Shkreli for nearly two decades and explains in his letter to the Court that:

> Mr. Shkreli has long been a pillar of his community and his family is considered to be among the most honorable and reliable, particularly to those in need of help. ... [Mr. Shkreli is] a long tenured and successful contractor and real estate investor. He has helped countless other people follow in his footsteps and mentored them in starting and growing their own companies. Mr. Shkreli has always been one of the most generous people I know with both his time and money—founding and supporting various soccer programs and initiatives, actively supporting his church and giving to countless charities. In many cases I witnessed his generosity firsthand.

(See letter of Richard Lukaj at Exhibit 5).

Mark DeFazio, MCB's CEO, writes:

> Martin is also a well-respected member of his community. ... Martin is very involved in the betterment of the Albanian community through political and community based organizations. I have personally observed the extraordinary

THOMPSON HINE

degree of respect and reliance the community gives and expects of Martin. He is highly regarded for his selflessness and has spent endless hours working with and helping community members of all ages.

(See Ex. 4).

Similarly, Jack Forgash, who has known Mr. Shkreli for twenty three years, described Mr. Shkreli as a "humanitarian" writing:

> As I got to know Mr. Shkreli personally, I discovered that he was involved in many humanitarian causes. In addition to the many causes he supported, both actively and financially, he would always find time to help immigrants who came to the United States by finding them jobs, places to live, and giving advice as to how best to succeed.

(See letter of Jack Forgash at Exhibit 6).

Mr. Shkreli was an active leader of the National Albanian American Council (NAAC) for more than ten years. The NAAC is a nonprofit organization dedicated to advocating for Albanians and promoting peace and economic development in the Balkans by fostering democratic policy, promoting respect for human rights, and conducting educational and developmental programs. Some of the NAAC's core activities and goals include:

- providing timely information and analysis of Albanian issues to U.S. government officials and policymakers in Washington, D.C., issuing press releases and position papers and providing expert testimony for U.S. Congressional briefings;

- engaging the Albanian-American community in the U.S. democratic process by routinely arranging meetings between community members and their elected Congressional representatives, hosting public forums by senior U.S. government officials and Balkan scholars around the country, and educating Albanian-American voters to increase their participation in elections;

- assisting Albanians in the Balkans to build strong democratic institutions by co-sponsoring roundtable conferences in Washington, D.C. about the challenges facing the region and offering possible solutions to meet those challenges; and

- seeking to help the Albanian people of the Balkans, especially the children, rebuild their lives, which were shattered by a decade of war, through various grants and charities to local, non-profit humanitarian organizations.

Mr. Shkreli began serving on the NAAC's Board of Trustees in 2003 and held various leadership roles in the organization. From 2010 to 2014, Mr. Shkreli held the organization's highest leadership position serving as Chairman of the NAAC. About Mr. Shkreli's service to the NAAC, Richard Lukaj explains:

5

> I probably got to know Mr. Shkreli best during our more than a decade of service for the National Albanian American Council, the leading Albanian American community organization, which among other things, supported and advocated for the rights of Albanians suffering through the darkest times of the conflicts in the Western Balkans. I served as Chairman of the organization for several years during which time Mr. Shkreli was one of the most active and generous donors and also served on the Board. Mr. Shkreli subsequently replaced me as Chairman after my tenure expired. During our many years working together with the organization, I witnessed a person of great compassion, excellent judgment and strong values. Mr. Shkreli always chose the high road on even the most difficult matters.

(See Ex. 5). Jack Forgash also commented about Mr. Shkreli's dedication to the NAAC writing:

> One humanitarian cause that Mr. Shkreli was deeply involved with was advocating for the people of Kosovo to become a free country. I remember Mr. Shkreli invited me to a National Albanian American Council fundraiser event in New York City, which he organized and chaired. It was eye opening to see how committed he was to assisting oppressed people and their plight. I was very impressed that the guest speaker at the event was President Bill Clinton. Mr. Shkreli sought me out to make sure that he introduced me to President Clinton. President Clinton undertook to protect the Kosovo people during their war, largely at the urging of Mr. Shkreli and his organization. Mr. Shkreli worked tirelessly to support the President in this cause. The war eventually ended as a result of American intervention and peace was restored to this region.

(See Ex. 6).

Hadar Bajraktari is a businessman and the founder of *Illyria*, an Albanian-American newspaper that he used to raise awareness about the atrocities endured by the people of Kosovo and the Balkans. As a result of his work with the newspaper, Mr. Bajraktari became very involved in the Albanian community and met Mr. Shkreli who was also very active. About first working with Mr. Shkreli, he noted:

> Right away I noticed Martin's passion for trying his best to help others. Whenever, the Community was organizing a demonstration, a fundraiser or a religious event, Martin was always one of the first people to call and he always answered. I noticed how much he was involved in our community events.

(See Ex. 3).

In 1984, Mr. Shkreli, who was an avid soccer player and coach for many years, founded the Vllaznimi Soccer Club, Inc., a non-profit soccer team for underprivileged members of the Albanian community in the Bronx. Mr. Shkreli served as the team's president, coach and

THOMPSON HINE

fundraiser for nearly twenty years and touched the lives of hundreds of struggling Albanian youth during that time.

In addition to these charitable endeavors, Mr. Shkreli was actively involved in fundraising for the Israeli not for profit organization Just One Life, which serves to empower women who find themselves in crisis during pregnancy by providing professional counseling and financial assistance. Mr. Shkreli also used his fundraising expertise to help raise significant money for the American University in Kosovo, Mother Teresa Cathedral in Kosovo and Our Lady of Shkodra Church in Hartsdale, New York, where Mr. Shkreli and his family are members.

## II.  THE OFFENSE CONDUCT[3]

Approximately five or six years ago, Mr. Shkreli became acquainted with Albert Veliu. Mr. Veliu worked as a driver for the Kosovo consulate, which was located in the same building as Mr. Shkreli's company. Mr. Shkreli became aware that Mr. Veliu was looking for opportunities to make extra money and on occasion, Mr. Shkreli would hire Mr. Veliu to be a driver for him or others in his company. Over the years, Mr. Shkreli became a friend and mentor to Mr. Veliu who would often seek Mr. Shkreli's advice and assistance. In early 2017, Mr. Veliu approached Mr. Shkreli and told him he was acquainted with a company, Temaco Electronics Corporation ("Temaco"), that had $135,000 in cash and asked Mr. Shkreli if he would be willing to exchange the cash for a company check. Mr. Shkreli believed that the cash was coming from a legitimate company and that the cash was obtained as a result of legitimate business transactions. It was never communicated to Mr. Shkreli that the cash was purportedly the proceeds of illegal activity and Mr. Shkreli had no knowledge whatsoever that Mr. Veliu was involved in any of the illegal conduct described in the indictment. Mr. Shkreli gave Mr. Veliu a check from his company in the amount of $135,000, payable to Temaco, in exchange for that exact amount in cash. He did not receive any fee or financial benefit for his participation in the transaction. He received $135,000 cash and gave Mr. Veliu a check for that exact amount. Mr. Shkreli was not aware that Mr. Veliu was actually given $150,000 by the confidential source and has only subsequently learned that Mr. Veliu apparently kept $15,000 of that money for himself. Mr. Shkreli has accepted full responsibility for his illegal conduct in this matter, to wit: that he intentionally failed to report the currency transaction as detailed in his plea allocution. But unlike several of his co-defendants, Mr. Shkreli did not engage in a money laundering transaction as he had no knowledge that the cash was purportedly the proceeds of illicit activity.

Although, Mr. Shkreli did not receive a fee or any financial gain from the transaction and was unaware that Mr. Veliu pocketed $15,000 of the money he received from the confidential source, Mr. Shkreli nonetheless agreed to forfeit $15,000 to the government. Mr. Shkreli has already made that payment in full.

---

[3] The government agrees with defendant's factual recitation of the offense conduct as indicated in Probation's addendum to the PSR and the government's sentencing memorandum.

7



### III. THE SENTENCING GUIDELINES AND OBJECTIONS TO PSR

The parties and Probation agree that the appropriate Guidelines calculation is as follows:

| | |
|---|---:|
| Base offense level (§ 2S1.3(a)(2)): | 6 |
| Plus: Funds exceeded $95,000 (§ 2B1.1(b)(1)(E)): | +8 |
| Minus: Minor Role Adjustment (§ 3B1.2(b)): | -2 |
| Total Offense level: | 12 |
| Acceptance of responsibility (§ 3E1.1(a)): | -2 |
| Total Adjusted Offense Level: | 10 |

With a Criminal History Category I, level 10 is in Zone B and equals a recommended range of imprisonment of 6-12 months. However, an alternative non-custodial sentence is authorized by U.S.S.G. §5B1.1(a)(2).

### IV. A PROBATIONARY SENTENCE IS WARRANTED AND SATISFIES FEDERAL SENTENCING OBJECTIVES UNDER 18 U.S.C. § 3553(a)

The Government requests that Mr. Shkreli be sentenced to a term of probation, which is appropriate in this case "because it reflects the seriousness of the defendant's crime of failing to file the required currency reports, while also accounting for his acceptance of responsibility in pleading guilty, and his personal history and characteristics." (See Government Sentencing Memorandum at 2). We respectfully ask the Court to impose such a probationary sentence for the reasons set forth below.

#### A. Applicable Legal Standards

18 U.S.C. § 3553(a) provides that the sentence be "sufficient, but not greater than necessary" to accomplish the goals of sentencing. These goals include the need for the sentence imposed to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). To this end, 18 U.S.C. § 3553(a) provides for variances from the advisory Guidelines range based on, *inter alia*, "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

The Supreme Court's post-*Booker* decisions have specified the procedure a district court must follow in sentencing. Although a sentencing court must calculate the applicable advisory Guidelines range, *Gall v. United States*, 552 U.S. 38, 50 (2007), the Guidelines serve as only a

"starting point" in determining a sentence, *United States v. Dorvee*, 604 F.3d 84, 91 (2d Cir. 2010), and a sentencing court "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50. The court must consider all of the sentencing factors enumerated under 18 U.S.C. § 3553(a) and "make an individualized assessment based on the facts presented." *Gall*, 522 U.S. at 50; *see also United States v. Rigas*, 583 F.3d 108, 116 (2d Cir. 2009) ("a District Court must make an individualized assessment based on all of the sentencing factors in § 3553(a)"). A court "errs procedurally if it does not consider the § 3553(a) factors." *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008).

### B. Mr. Shkreli's Personal History and Family Circumstances Weigh Heavily in Favor of a Sentence of Probation

Mr. Shkreli appears before this Court at age 61 with no prior criminal record or history of drug or alcohol abuse. He has lead an exemplary and law-abiding life and been a role model to his family and community. As a testament to Mr. Shkreli's history and character, the Court has been provided with numerous, compelling letters on his behalf, which consistently describe Mr. Shkreli as an honest, trustworthy man of integrity who has contributed extraordinary amounts of his time to help those less fortunate in his community. These people all stand behind Mr. Shkreli despite full knowledge of his conduct and conviction. For more than ten years, Mr. Shkreli served on the board of trustees and later as Chairman of the NAAC, a not-for-profit organization dedicated to fostering human rights for Albanians suffering through the conflicts in the Western Balkans. Among numerous other charitable endeavors, Mr. Shkreli also founded a not-for-profit soccer league as an outlet for underprivileged youth in the Albanian community. What is most striking is that Mr. Shkreli did not only contribute money to his various charities; he contributed countless hours of his time to take active leadership and organizational roles in the causes most dear to him.

Mr. Shkreli is also deeply remorseful for his unlawful conduct. He recognizes the foolishness of his actions and is committed to never again going astray of the law. In his letter to the Court, Mr. Shkreli explains:

> I am writing you this letter to express my sincerest remorse and regret for my irresponsible and careless conduct in April of 2017. ... There is no excuse for my poor choice of action and I accept full responsibility for what I've done. Throughout my life I have always tried to set a proper example for my family, friends and employees, but a serious lapse in judgement tarnished everything I've worked so hard to become. I have kept a clean record my entire life and I never expected to find myself in a situation like this, especially at 61 years old. ... I am very well aware of the poor decision I made and I know I can't blame anyone but myself. I have let down my family, friends and employees by making a foolish decision. I am embarrassed and ashamed for my behavior. I hope the court can realize that I am a good person who made a serious mistake. This unfortunate set of circumstances has provided myself and my family with a valuable lesson and I know that I will never make a mistake like this again.

THOMPSON HINE

(See Martin Shkreli's letter at Ex. 1).

Others close to Mr. Shkreli have also observed his genuine contrition for his actions. Alex Shkreli writes:

> [My father] has always tried to do what's right, but unfortunately made a serious mistake, which was completely out of character for him. Knowing my father my entire life, I can say that he deeply regrets the decision he made and has made it very clear to our family several times. ... My father has always been a good upstanding citizen and has never been in trouble with the law prior to this. The impact that this has had on us is something I wouldn't wish on anyone, but it has shown my family how a single bad decision can alter your image and life. I think it is very safe to say that my father has learned his lesson.

(See Ex. 2). Mark DeFazio similarly elaborates about Mr. Shkreli's regret for his conduct:

> I have spoken to Martin at length about his situation and can confidently assure the court that Martin takes full responsibility for his actions. Knowing Martin for over twelve years, I am positive, without a shadow of a doubt, that Martin regrets deeply his conduct that lead to his legal troubles before the court. I am also sure that he will grow from this unfortunate experience and be an even better person in the end as he is truly resilient.

(See Ex. 4). Jack Forgash noted: "[f]rom conversations with [Mr. Shkreli], he is remorseful and saddened by his actions in this case. (See Ex. 6). Finally, Richard Lukaj explained:

> As time has passed, I have been pleased to see that Mr. Shkreli has somehow managed to also grow personally through it all. He remains the trustworthy, dependable person that he has always been, accepting full responsibility for his conduct and working exceptionally hard to rebuild his reputation while continuing to engage in his countless good deeds. Mr. Shkreli is inherently an honorable man, and has faced his legal problems with remarkable poise and maturity. He maintains a great constructive attitude and strong work ethic that will undoubtedly help him re-establish his personal life and business.

(See Ex. 5).

### C. The Need To Afford Adequate Deterrence to Criminal Conduct

As the government wrote in its sentencing memorandum, regarding Mr. Shkreli:

> a sentence of probation will serve the goal of both specific and general deterrence. This prosecution itself is meaningful punishment that will likely deter the defendant from reoffending. In addition, even a probationary sentence will serve the goal of general deterrence because others who are tempted to participate in

such criminal activities will understand that the consequences of such conduct include a felony conviction and its collateral consequences.

Furthermore, Mr. Shkreli has already been harshly punished for his conduct in several unforeseen and unfortunate ways. As the Court is aware, by chance, Mr. Shkreli was arraigned before Your Honor while a jury was deliberating in another matter before the Court; that of the more infamous Martin Shkreli. The courtroom was filled with members of the press awaiting a verdict in the other matter and they became fascinated with the fact that another Martin Shkreli was appearing before the Court. That day, and for several subsequent appearances in the instant matter, various news outlets routinely photographed and ran stories solely about Mr. Shkreli, even though he was only a minor, periphery figure in this case. For instance, on August 4, 2017, CNBC reported that Mr. Shkreli "was arraigned on money-laundering charges related to alleged drug trafficking by a gang that also is accused of trafficking in weapons from the nation of Kosovo."[4] No other defendants from this case were even mentioned. That same day, the New York Daily News ran an article, with a photograph of Mr. Shkreli, entitled: "Man named Martin Shkreli arraigned in gun-running case before same judge presiding over the Pharma Bro's trial."[5] Again, no other defendants from this case were even mentioned. After a subsequent status conference on October 2, 2017, the New York Post ran an article with a prominent photo of Mr. Shkreli. In the article, it states that Mr. Shkreli "allegedly took part in an $800,000 money-laundering scheme that imported drugs and weapons, including an M80 Zolja anti-tank rocket launcher and 15 AK-47s from Kosovo."[6] None of the other defendants were mentioned and it is undisputed that Mr. Shkreli was not involved in any way, and had no knowledge of, the allegations described in the article. These are just a few examples. There were countless other articles about Mr. Shkreli simply because of the coincidence of his name.

Mr. Shkreli's son Alex noted in his letter to the Court, that as a result of this incendiary press, Mr. Shkreli's "business began to suffer" as some existing and potential clients became fearful of being associated with him, not knowing if the allegations of gun-running, drug-trafficking and money laundering were true. Additionally, numerous of Mr. Shkreli's business and personal credit cards, bank accounts and insurance policies were suddenly cancelled without explanation. These included Mr. Shkreli's American Express and Chase Visa credit cards, his personal and business Chase bank accounts, and his AIG car and home insurance. Mr. Shkreli had to apply for new credit cards, bank accounts and insurance policies with significantly higher rates and premiums.

Hajdar Bajraktari commented on the effect this matter has had on Mr. Shkreli's reputation in the community writing:

---

[4] See, https://www.cnbc.com/2017/08/04/in-martin-shkrelis-courtroom-another-martin-shkreli-makes-appearance.html

[5] See, http://www.nydailynews.com/news/crime/man-named-martin-shkreli-arraigned-court-pharma-bro-article-1.3384414

[6] See, https://nypost.com/2017/10/02/other-martin-shkreli-might-take-plea-deal/

> You could imagine what a shock it was to hear that Martin had been arrested last year. I was even more shocked at how people were quick to dismiss the last thirty years of good work he had done in the Community and with his family and how it seemed that people were trying to erase him from existence.

(See. Ex. 3).

## CONCLUSION

All of the individuals who submitted letters on Mr. Shkreli's behalf urged the Court to show him leniency at sentencing. Richard Lukaj's letter captures this sentiment when he writes:

> Mr. Shkreli is among those very rare individuals that you meet in life who makes the world better around him and I believe he is destined to continue to make a difference in the lives of others in the future. I hope and pray that you will allow this man a chance to rebuild his life. ... I am hopeful that the judicial system, in rendering judgment on Mr. Shkreli, will be able to see him for the father, husband, friend, businessman, philanthropist and exemplary citizen he has been his whole life, aside from his recent, unfortunate lapse in judgement. (See Ex. 5).

For all of the above reasons, we respectfully ask this court to fashion a sentence that meets the ends of justice without imposing a term of incarceration. A sentence that takes full recognition of the human condition does not detract from the proper respect for the law. On the contrary, the authority and the duty of the Sentencing Court to fully account for the unique circumstances of the individual are well within the Court's province. Imposing a sentence of probation will insure a proper respect for the law. Such a sentence is warranted and would reasonably render justice with mercy.

Respectfully submitted,

Brian D. Waller (BDW-7163)
Thompson Hine LLP
335 Madison Avenue
12th Floor
New York, NY 10017
(212) 908-3932

*Counsel for Defendant Martin Shkreli*

cc: AUSA Michael Kielty